UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GEORGE A. RHODES                              CIVIL ACTION

VERSUS                                        NO. 22-1145

BRYAN CHEVROLET, LLC, *et al.*                SECTION M (5)

## ORDER & REASONS

Before the Court is a motion for summary judgment filed by defendants Bryan Imports, LLC ("Bryan Imports") and Bryan Chevrolet, LLC ("Bryan Chevrolet") (together, "Defendants" or "the Bryan Companies")[1] pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] Plaintiff George A. Rhodes opposes the motion,[3] and Defendants reply in further support of their motion.[4] Considering the parties' memoranda, the record, and the applicable law, the Court grants the motion and dismisses Rhodes's claims.

## I.    BACKGROUND

This case involves Rhodes's claims of age discrimination against the Bryan Companies.[5] Bryan Imports, a subsidiary of Bryan Chevrolet, terminated Rhodes's employment in 2019.[6] The Bryan Companies operated two dealerships – a Chevrolet dealership and a Subaru dealership.[7] In the run-up to Rhodes's termination, the Bryan Companies employed approximately 150 employees

---

[1] At the time of the plaintiff's termination, the companies were Bryan Chevrolet, Inc. and Bryan Imports, Inc. R. Doc. 38-4 at 26.  Six months later, in December 2019, both companies were converted to limited liability companies. *See id.*
[2] R. Doc. 38.
[3] R. Doc. 49.
[4] R. Doc. 52.
[5] R. Doc. 1.
[6] *Id.* at ¶ 13.
[7] R. Doc. 7 at 2.

1

between both dealerships, but employed only two service managers, one at each dealership.  The two service managers were Rhodes and Jason Gullo.

Rhodes was first hired by Bryan Chevrolet as a technician on March 1, 1993, and was promoted to Subaru service manager (at the Subaru dealership) on October 1, 2005.[8]  Gullo was first hired as a service advisor in the Subaru service department on July 15, 2015, and was promoted to Chevrolet service manager (at the Chevrolet dealership) on March 15, 2017.[9]  Rhodes had approved and encouraged Gullo's promotion.[10]

On July 29, 2019, Bryan Chevrolet sold the Chevrolet dealership to MBC Metairie, LLC and MB Automotive Management, Inc.[11]  As a result of the transaction, approximately 100 of the Bryan Companies' 150 employees, including Rhodes, were laid off as part of a substantial reduction-in-force necessitated by the sale.[12]  The Bryan Companies retained ownership of the Subaru dealership and reassigned Gullo to be its service manager.[13]

Upper-level managers at the Bryan Companies, referred to as the "leadership team," decided which employees would be retained, reassigned, or terminated following the sale of the Chevrolet dealership.[14]  The leadership team consisted of James Bryan, Jr. ("Jay Bryan") (president and sole shareholder of Bryan Chevrolet),[15] Marshall Soullier (general manager of

---

[8] R. Docs. 1 at ¶ 6; 38-4 at 10.
[9] R. Doc. 38-2 at 4.
[10] *Id.* at 4-5.
[11] R. Docs. 1 at ¶ 13; 7 at 2.
[12] R. Docs. 1 at ¶ 13; 7 at 2.
[13] R. Docs. 1 at ¶ 13; 7 at 2.
[14] R. Doc. 49-1 at 4-5.
[15] *Id.* at 2.

Bryan Chevrolet),[16] and Stephanie Held Johnson (comptroller for Bryan Chevrolet).[17]  Jay Bryan's son, William Bryan ("Will Bryan"), was a vice president of Bryan Subaru.[18]

On July 19, 2019, twelve days before the sale of the Chevrolet dealership, the leadership team terminated Rhodes's employment and later reassigned Gullo to be the service manager for the Subaru dealership.[19]  At the time of Rhodes's termination, he was 62 years of age,[20]  Gullo was 41,[21] Jay Bryan was 60,[22] Soullier was 67,[23] Johnson was 48,[24] and Will Bryan was 27.[25]

As service manager, Rhodes managed and supervised approximately 15 employees.[26]  He is an ASE Master Mechanic, certified in all eight of the major areas of certification for a mechanic.[27]  Gullo had managed and supervised more than 15 employees at the Chevrolet dealership.[28]  Gullo was not an ASE Master Mechanic and had none of the standard mechanic certifications.[29]  Rhodes alleges that, for some amount of time, he helped Gullo with his transition from service advisor to service manager.[30]

---

[16] *Id.*

[17] *Id.* at 3.

[18] Defendants insist that Will Bryan was not part of the leadership team and played no role in terminating Rhodes.  R. Doc. 38-2 at 3.  Although Rhodes does not actually allege that Will Bryan was part of the "leadership team" (and, in fact, admits that it was Jay Bryan, Soullier, and Johnson, "as members of Bryan Chevrolet Inc.'s leadership team[, who] assessed and evaluated which employees would be retained or terminated"), Rhodes does allege that Will Bryan "spoke with the plaintiff about management matters, including the various directions the company should go in to modernize or improve its operations."  R. Doc. 49-1 at 5-6.

[19] *See id.* at 1-2, 10.

[20] R. Doc. 49 at 4.  Rhodes's date of birth is October 23, 1956.  R. Doc. 38-7 at 4.  While the complaint states that Rhodes was 63 at the time of his termination, R. Doc. 1 at ¶ 5, Rhodes corrects this statement in his opposition to the instant motion.  R. Doc. 49 at 4.

[21] R. Doc. 1 at ¶ 7.

[22] R. Docs. 49-1 at 2.

[23] *Id.*

[24] *Id.*

[25] R. Doc. 38-6 at 1.

[26] R. Docs. 49-1 at 6; 38-7 at 102-03.

[27] R. Doc. 49-1 at 13.  The National Institute for Automotive Service Excellence, or ASE, is a professional service group that certifies individuals and shops in the automotive repair and service industry.

[28] R. Doc. 38-2 at 5.

[29] R. Doc. 52-1 at 7.

[30] Rhodes states in his deposition that he helped Gullo for "a few weeks," R. Doc. 38-7 at 121, but he states in his declaration that he helped Gullo for "approximately one year."  R. Doc. 49-3 at 3.

During his 14-year tenure as Subaru service manager, Rhodes attended the Bryan Companies' weekly department-head meetings.[31]  He alleges that during these meetings, over the whole of this period, Jay or Will Bryan made five to ten jokes or comments about the aging management group.[32]  Rhodes alleges that some of these jokes were about the greater medical costs of older employees.[33]  Rhodes further alleges that after hearing these comments, he would bring them up to either Jim Davies, Soullier, or Will Bryan, asking if he should be worried, but they would tell him, "No, no, numbers are good. You got nothing to worry about,"[34] or "You're better than okay."[35]

Davies was employed as the general manager of Bryan Subaru from 2006 to November 30, 2017.[36]  In his declaration, Davies states that on "numerous occasions" in department-head meetings, Jay Bryan stated his intent to get rid of older employees, particularly in management, and that he wanted to have a younger management group to save on payroll and health benefits.[37]  Davies also states that Jay Bryan expressed frustration to him at the appearance of photographs taken of dealership employees and that Jay Bryan privately complained to Davies about being "saddled" with elderly employees after taking over the Bryan Companies from his father.[38]  Davies states that Will Bryan also commented that they needed a younger management group and that a

---

[31] R. Doc. 38-7 at 133.
[32] R. Docs. 49-1 at 10 ("[T]here had long been statements of discriminatory intent, which had gone back approximately 14 years at department head meetings and in other conversations."); 38-7 at 70 (deposition of Rhodes: "I knew about for years that every time I'd walk in – most times, I'm sorry, not every, not more than ten through the years, over five times, we'd have department head meetings every so often ....  And in these meetings, at the end of the desk was Jay, his son Will, and our controller, Stephanie.  And in these meetings ... jokes were made about our aging management crew and such, and there's a little laugh at the other side of the desk[.]"); 49 at 8 ("Plaintiff is well aware of the argument that such talk is just 'stray comments', although in this case it was stray comments over a period of 14 years at the highest level of management and including 2 of the three members of the purportedly businesslike team which made the decision to terminate.").
[33] R. Docs. 38-7 at 126; 49 at 8.
[34] R. Doc. 38-7 at 70-71.
[35] *Id.* at 125.
[36] R. Doc. 49-2 at 1.
[37] *Id.*
[38] *Id.*

4

younger management group would save on salary and benefits.[39]  Davies adds that he himself commented during department-head meetings on the need for a younger management group.[40]

Following the termination of his employment in July 2019, Rhodes timely filed an age-discrimination charge with the Equal Employment Opportunity Commission ("EEOC").[41]  On January 26, 2022, the EEOC issued its determination not to proceed and notified Rhodes of his right to sue.[42]  Rhodes then filed this suit against Defendants, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.[43]  Defendants later filed the instant motion for summary judgment.[44]

## II.    PENDING MOTION

In their motion, Defendants argue that Rhodes fails to state a *prima facie* case of age discrimination because: (1) he has no proof of any adverse employment action because of his age; (2) he was not treated differently than any similarly situated person because of his age; and (3) Bryan Chevrolet terminated his employment because of a large reduction-in-force necessitated by the sale of its Chevrolet dealership.[45]  Alternatively, Defendants contend that even if the Court finds that Rhodes has stated a *prima facie* case of age discrimination, Bryan Chevrolet had legitimate, non-discriminatory reasons to terminate Rhodes's employment and to retain Gullo as the Subaru service manager.[46]  Defendants state that they terminated Rhodes's employment because of the reduction-in-force necessitated by the sale of the Chevrolet dealership and after their leadership team evaluated the comparative performances of Rhodes and Gullo.[47]  Lastly,

---

[39] *Id.*
[40] *Id.*
[41] R. Doc. 1 at ¶ 21.
[42] *Id.* at ¶ 22.
[43] R. Doc. 1.
[44] R. Doc. 38.
[45] R. Doc. 38-2 at 2.
[46] *Id.*
[47] *Id.* at 15-16.

Defendants assert that Rhodes cannot sustain his age-discrimination claim because (1) Jay Bryan, a member of the leadership team that chose to terminate Rhodes, had participated in the initial decision to promote Rhodes to service manager; (2) the members of the leadership team were in the same age-protected class as Rhodes; (3) older employees were retained following the sale of the Chevrolet dealership;[48] and (4) the alleged five to ten discriminatory comments made by certain high-level managers over a period of 14 years are merely "stray remarks."[49]

In opposition, Rhodes argues that he has stated a *prima facie* case of discrimination and that Defendants have failed to show a legitimate non-discriminatory reason for Rhodes's termination.[50]  Rhodes argues further that even if Defendants have met their burden of production, their stated reason for terminating him constitutes pretext for discrimination, given the alleged discriminatory comments and that he was "clearly better qualified" than Gullo.[51]  Rhodes explains that while he is "well aware of the argument that such talk is just 'stray comments,' … in this case it was stray comments over a period of 14 years at the highest level of management and including 2 of the three members of the purportedly businesslike team which made the decision to terminate."[52]  Finally, Rhodes contends that the various other defenses raised by Defendants are not applicable.[53]

In reply, Defendants reemphasize their stated legitimate, non-discriminatory reasons for terminating Rhodes's employment and assert that Rhodes has failed to produce sufficient evidence to support his claim.[54]  In particular, Defendants argue that Gullo was fully qualified for the

---

[48] *Id.* at 16-17.
[49] *Id.* at 13.
[50] R. Doc. 49.
[51] *Id.* at 3-6.
[52] *Id.* at 8-9.
[53] *Id.* at 1, 11-15.
[54] R. Doc. 52.

position of service manager and reiterate that the alleged discriminatory comments are nothing more than stray remarks.[55]

## III.     LAW & ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*.  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *Id*. at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.  *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The substantive law identifies which facts are material.  *Id*.  Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014).  Unsubstantiated assertions, conclusory

---

[55] *Id.*

allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**B.   The ADEA and the *McDonnell Douglas* Burden-Shifting Framework**

The ADEA prohibits employers from discharging an individual because of his age. 29 U.S.C. § 623(a).  To establish a claim for violation of the ADEA, a plaintiff "must show that his age was the 'but-for' cause of his termination – proving that age was a 'motivating factor' for the decision is not enough."  *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)). A plaintiff may prove that age was a "but-for" cause of his termination with direct or circumstantial evidence.  *Id.* at 455-56.

When a plaintiff offers no direct evidence of age discrimination, the *McDonnell Douglas* burden-shifting framework applies.  *Id.* at 456.  The burden is first on the plaintiff to establish a *prima facie* case of age discrimination.  *Id.*  "To establish a *prima facie* case of age discrimination, 'a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age.'"[56] *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir.2007)).

---

[56] Although not raised by the parties, the Court notes that reduction-in-force cases typically require the use of a different set of elements to prove a *prima facie* case of discrimination.  *See McMichael*, 934 F.3d at 456 n.4 ("In a reduction-in-force case, a party makes out a prima facie case of age discrimination by showing '(1) that he is within the protected age group; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'") (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)); *see also Sullivan v. Worley Catastrophe Servs., LLC,* 2013 WL 5530277, at *6 (E.D. La. Oct. 7, 2013) ("The elements of a prima facie case are slightly different in a reduction-in-force case."), *aff'd,* 591 F. App'x 243 (5th Cir. 2014).  This is because, in reduction-in-force cases (unlike ordinary ADEA cases), it is often "impossible" to show that a plaintiff was replaced by a younger employee since the plaintiff's position has usually been eliminated.  *McCann v. Tex. City Refin., Inc.*, 984 F.2d 667, 670 n.4 (5th Cir. 1993).  However, in this case, Rhodes's position had not been eliminated.  Therefore, the Court will apply the usual *prima facie* elements.

Next, if the plaintiff establishes a *prima facie* case, there is a presumption of discrimination, and the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff." *Berquist*, 500 F.3d at 356 (quotation omitted). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). In other words, a defendant meets its burden of production if its stated reason, "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Hicks*, 509 U.S. at 509) (emphasis omitted).

Lastly, if the defendant articulates a legitimate, non-discriminatory reason, "the plaintiff must rebut the employer's purported explanation by showing that the reason given is merely pretextual." *McMichael*, 934 F.3d at 456. "To show pretext, a plaintiff must present enough evidence for a reasonable jury to believe that [the employer's] 'reasons are pretexts for unlawful discrimination.'" *Id.* at 456-57. "A plaintiff can do so by showing that: (1) a discriminatory reason more likely motivated the employer; (2) the employer's reason is unworthy of credence; or (3) he is clearly better qualified than the person selected for the position." *Id.* at 457 (internal citations and quotations omitted). "At summary judgment, [a plaintiff] must offer enough evidence to raise a genuine question of fact regarding [the employer's] reasons for firing him." *Id.* at 456.

### 1. Rhodes Has Established a *Prima Facie* Case of Age Discrimination

Here, Rhodes has established a *prima facie* case of age discrimination. The Bryan Companies concede that (1) Rhodes was terminated by the Bryan Companies,[57] (2) he was

---

[57] R. Doc. 38-2 at 11.

qualified for the position,[58] (3) he was 62 years of age at his termination,[59] and (4) he was replaced by someone younger.[60]   Accordingly, the burden shifts to the Bryan Companies to articulate a legitimate, non-discriminatory reason for their decision to terminate Rhodes.

### 2. Defendants Have Articulated Legitimate, Non-Discriminatory Reasons for Terminating Rhodes

According to Defendants, Bryan Chevrolet "had to terminate one of its two Service Managers because it would no longer be operating a Chevrolet dealership and would thus only need a single Service Manager to oversee the Subaru Service Department."[61]  Thus, there are two parts to the Bryan Companies' reason for terminating Rhodes: (1) their reduction-in-force due to the sale of the Chevrolet dealership; and (2) their comparative evaluation of the two service managers (Rhodes and Gullo) in deciding who to retain as part of the reduction-in-force.

As for the first part, the Fifth Circuit "has repeatedly held that a reduction in force is a legitimate reason for firing someone."  *McMichael*, 934 F.3d at 456 (collecting cases); *see also Cherry v. CCA Props. of Am., L.L.C.*, 438 F. App'x 348, 352 (5th Cir. 2011) ("This court has previously recognized that a reduction in force is a legitimate, non-discriminatory reason for termination.").  Accordingly, this part of the Bryan Companies' reason for terminating Rhodes is legitimate and non-discriminatory.

As for the second part, the Bryan Companies assert, and Rhodes admits, that "[i]n the months prior to the Sale, Mr. Bryan, Mr. Soullier and Mrs. Johnson as members of Bryan

---

[58] Defendants admit that "Mr. Rhodes was, by Mr. Jay Bryan's admission, qualified to work as Service Manager for the Subaru dealership once he completed his initial on-the-job training."  R. Doc. 52-1 at 2.

[59] R. Doc. 38-2 at 11 ("Bryan Chevrolet, Inc. concede[s] that Mr. Rhodes was over 40 years of age at the time of his termination and thus part of a protected class.").

[60] *Id.*  ("Bryan also concedes that Mr. Rhodes' job was eliminated in favor of a younger peer, Mr. Gullo, a younger person who was also a Service Manager and part of that same protected class.").  While the Bryan Companies have conceded that all four factors have been satisfied, they argue that Rhodes has failed to establish a *prima facie* case, citing case law and making arguments which the Court will address at the pretext stage of the *McDonnell Douglas* analysis.

[61] R. Doc. 38-2 at 15.

Chevrolet, Inc.'s leadership team assessed and evaluated which employees would be retained or terminated in the event that the Sale was finalized and occurred, because the Chevrolet dealership employed about twice as many employees as the Subaru dealership."[62]  In other words, because the Bryan Companies were eliminating two-thirds of their workforce, the leadership team met and evaluated their employees to determine who should be retained.  The Bryan Companies maintain that it was through this process that they determined that Gullo should be retained and reassigned to the Subaru dealership as its service manager and that Rhodes should be terminated.[63]  In particular, the Bryan Companies state that the "leadership team believed that Mr. Rhodes's performance, when compared to that of Mr. Gullo, warranted retaining Mr. Gullo as the single Service Manager."[64]  At his deposition, Jay Bryan, as the corporate representative of the Bryan Companies, further explained their reasons for choosing Gullo over Rhodes:

> Q.  So on behalf of the company, please list all the reasons for termination.
>
> A.  Jason [Gullo] had been running for two years a shop with twice the number of employees producing almost twice the number of ROs [*i.e.,* repair orders] that the Subaru store did –
>
> . . . .
>
> So he'd been handling twice the personnel, he'd been handling twice the business.  He had taken a shop that was torn apart by the prior service manager leaving and rebuilt it to a good running shop where they were doing – they'd gotten their CSI [*i.e.,* customer satisfaction index] up to be some of the best in the area, and he'd done a fabulous job, his production there had been fantastic.  His customer satisfaction had been fantastic.  And he – say Mickey [Rhodes], had been telling us, telling both Marshall [Soullier] and myself, that he wanted to work less hours.  And we were in the midst of doing a $3 million renovation of service, adding almost 50% more stalls, needing 50% more technicians.  And all Mickey [Rhodes] been telling us was he wanted to work less.  And here I am fixing to spend $3 million to increase the size of my shop by 50% because of the growth of the Subaru sales business.  The factory was pretty much demanding that we increase the size of the shop.  The last thing I needed was someone – the service manager wanting to work less hours when I needed somebody who wanted to work more.  And I needed somebody that was

---

[62] R. Doc. 49-1 at 5.
[63] R. Doc. 38-2 at 15.
[64] *Id.*

committed to the Bryan Subaru family.   And, you know, I just needed somebody that was committed and that was a good performer, a proven good performer in handling a bigger shop and growing.   And we wanted the best person for the job, and that's who we hired.[65]

Under the established law of the Fifth Circuit, these are legitimate, non-discriminatory reasons for terminating Rhodes in favor of Gullo.  *See, e.g., McDaniel v. Nat'l R.R. Passenger Corp.*, 705 F. App'x 240, 245-46 (5th Cir. 2017) ("Amtrak asserts six reasons for hiring Popo over McDaniel: Popo's work ethic, her strong leadership skills, her strong interview performance, her management experience, McDaniel's poor interview performance, and his 'lacking' leadership style.  These are legitimate, non-discriminatory reasons to prefer one candidate over another, as we have previously confirmed in an unpublished decision.") (citing *Gregory v. Town of Verona*, 574 F. App'x 525, 528 (5th Cir. 2014)).  Accordingly, the Bryan Companies have met their burden of production, and the burden shifts back to Rhodes to demonstrate pretext.

### 3.   Rhodes Has Not Offered Sufficient Evidence of Pretext

Rhodes has not offered sufficient evidence to create a genuine issue of material fact that a discriminatory reason more likely motivated his termination, that the Bryan Companies' proffered reasons for terminating him are unworthy of credence, or that he is clearly better qualified than Gullo.  To prove pretext, Rhodes points to comments made by Jay and Will Bryan and asserts that he was "clearly better qualified" than Gullo.

#### a. *Discriminatory Comments*

"A plaintiff can show pretext and discriminatory motive by pointing to age-related comments made by a person in charge of firing.  A plaintiff can use these comments in both direct and indirect evidence cases." *McMichael*, 934 F.3d at 457.  Thus, comments are subject to one of

---

[65] R. Doc. 38-4 at 23-25.

two standards, depending on whether the comments are being used as direct evidence[66] or indirect

(*i.e.,* circumstantial) evidence of discrimination:

> In direct evidence cases, comments must meet a demanding standard because the plaintiff relies on them "to prove the entire case of discrimination." *Goudeau v. Nat'l Oilwell Varco, L.P.,* 793 F.3d 470, 475 (5th Cir. 2015). For age-related comments to show pretext in a direct evidence case, they must be more than "stray remarks." [*EEOC v.*] *Tex. Instruments,* [*Inc.,*] 100 F.3d [1173,] 1181 [(5th Cir. 1996)] ("This court has repeatedly held that 'stray remarks' do not demonstrate age discrimination."). To rise above the level of a stray remark, an age-related comment must "be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Id.* More specifically, for a comment to prove age discrimination it must be "1) age related, 2) proximate in time to the employment decision, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue." *Moss* [*v. BMC Software, Inc.*], 610 F.3d [917,] 929 [(5th Cir. 2010)].
>
> . . . .
>
> In indirect evidence cases, courts apply a less demanding standard because "the discriminatory remarks are just one ingredient in the overall evidentiary mix." *Goudeau,* 793 F.3d at 475 (holding that discriminatory remarks are relevant at the pretext stage and a less "demanding text applies"). Under this less demanding standard, the plaintiff must show that the comments involve "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Squyres v. Heico Cos., L.L.C.,* 782 F.3d 224, 236 (5th Cir. 2015).

*McMichael*, 934 F.3d at 457-58. Courts typically only find a statement to be evidence of age

discrimination in two situations – namely, "where a statement references age in a derogatory or

stereotypical way," such as telling an employee, "You're too old"; and "where the employer's

statement shows a desire to replace older employees with younger ones." *McMichael*, 934 F.3d at

458 (citations omitted).

---

[66] "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993).

Here, Rhodes puts forward the following comments as indirect evidence of pretext:[67]

1. At department-head meetings, Rhodes personally heard five to ten comments or jokes made by Jay or Will Bryan about the aging management group, particularly regarding their higher medical costs.[68]

2. Will Bryan spoke to Rhodes, usually one-on-one, about replacing older employees with younger ones.[69]

3. At department-head meetings, Davies heard Jay Bryan on "numerous occasions" state his intent to get rid of older employees, particularly in management, and that he wanted to have a younger management group to save on payroll and health benefits.[70]

---

[67] Although both Rhodes and Defendants cite case law addressing the four-prong direct evidence test instead of the two-prong indirect evidence test (R. Docs. 49 at 9-10; 52 at 7), the parties also apply the *McDonnell Douglas* burden-shifting framework, which only applies in cases involving indirect evidence. If Rhodes were attempting to offer the remarks as direct evidence, his effort would fail because none of the comments were related to Rhodes's termination and none are said to have been made proximate in time to Rhodes's termination. In fact, Rhodes does not identify when any of the comments were made – only that they were made during department-head meetings over a 14-year period. *See* R. Doc. 49-1 at 8. Therefore, under the direct evidence test, the alleged comments would unquestionably be considered "stray remarks." *See Simmons v. Greyhound Lines, Inc.*, 2020 WL 61039, at *9 (M.D. La. Jan. 6, 2020) ("Although Plaintiff vaguely asserts that these comments were made 'constantly,' which he defines as 'about three, four times a month,' Plaintiff never specifies a time near his discharge; thus, he has failed to meet his burden to show that the comment was proximately related to his termination because he failed to establish when such comments were actually made. Because Plaintiff has only submitted circumstantial evidence related to his age, the Court turns to analysis of the *McDonell Douglas* burden-shifting framework.").

[68] R. Docs. 49 at 8 ("[I]t was stray comments over a period of 14 years at the highest level of management and including 2 of the three members of the purportedly businesslike team which made the decision to terminate."); 38-7 at 70 (deposition of Rhodes: "I knew about for years that every time I'd walk in – most times, I'm sorry, not every, not more than ten through the years, over five times, we'd have department head meetings every so often .... And in these meetings, at the end of the desk was Jay, his son Will, and our controller, Stephanie. And in these meetings, as the jokes were made about our aging management crew and such, and there's a little laugh at the other side of the desk, Stephanie was good enough to say, 'Hey, hey, guys,' to Jay and Will, 'We shouldn't be talking about this in front of this group.' And this happened a bunch of times, and I always felt – I was very uneasy about it."), 78 (deposition of Rhodes: "But it was frightening to me because the youth and old thing came up too much, and the new way, new direction, different direction, we need to think a little differently, old people, how much cheaper it would be on our medical and such if they weren't around. This stuff happened in department head meetings, and many people saw this with me, many."), 126 (deposition of Rhodes: Q. "What specifically did Jay say that you recall?" A. "Things would be a lot cheaper if we had a lot younger group in here. I mean, we have a bunch of older people. As far as our hospitalization goes, wouldn't this be a lot less. Maybe jokes about – not maybe, jokes about people falling down. I don't remember who. Somebody slipped. Rex slipped on the Subaru driveway and hurt his back. Rex is an older salesman. I don't know if he's still there or not. Probably is, nice guy. Just different things have come up when an older person went down.").

[69] R. Doc. 38-7 at 70-71 (deposition of Rhodes: "And then what made it even worse was Will Bryan on once again, less than ten, more than five times, sitting in my office and telling me the same words. Want to go in a different direction. I don't like all this old thinking." Q: "This was Will?" A: "Will Bryan. Yes, sir. Usually one on one. Come in, close my door. Here's some ideas I have. We've got a lot of old people, and he'd say, Mickey, I probably shouldn't be talking about this, but things are good over here. You got nothing to worry about. We're going to get some younger thinking in here and start moving some of these old folks out.").

[70] R. Doc. 49-2 at 1-2.

4.  At department-head meetings, Davies heard Will Bryan state that the Bryan Companies needed to get rid of older managers, that they needed a younger management group, and that a younger management group would save on salary and benefits.[71]

5.  Jay Bryan privately complained to Davies about being "saddled" with elderly employees after taking over the Bryan Companies from his father and that he did not want to have any of the frustration which he claimed to have experienced from putting up with their health problems.[72]

6.  Davies heard Jay Bryan express his frustration "at the appearance of photographs taken of dealership employees for use in advertising because he perceived that the overall appearance was that of older employees, and he wanted a younger look for the dealership which could only be achieved by getting rid of a significant number of older employees."[73]

Some of these comments seem to involve discriminatory animus, as they show a desire to replace older employees with younger ones, and some of the comments were made by a decision maker.  Jay Bryan was a member of the leadership team who decided to terminate Rhodes,[74] so his comments meet the second prong of the analysis.  As for Will Bryan's comments, Rhodes neither admits nor denies that Will Bryan "had no part or role in the decisions to terminate Mr. Rhodes' employment as the Subaru Sales Manager and to transfer Jason Gullo … to become the Subaru Service Manager after Mr. Rhodes' transfer."[75]  Instead, Rhodes responds that "Will Bryan told the plaintiff that he was a Vice-President and persistently spoke with the plaintiff about management matters, including the various directions the company should go in to modernize or improve its operations.  Additionally, Mr. Will Bryan was a corporate Vice-President who exercised some of the powers expected of such an office …."[76]  Rhodes admits, though, that "Mr. Bryan, Mr. Soullier, and Mrs. Johnson, as members of Bryan Chevrolet, Inc.'s leadership team, were involved with and made the decision to terminate Mr. Rhodes' employment, as well as other

---

[71] *Id.* at 2.
[72] *Id.*
[73] *Id.*
[74] R. Doc. 49-1 at 6.
[75] *Id.*
[76] *Id.*

employees."[77]  That Will Bryan had the title of vice president does not establish that he had any

influence or leverage over any of the three decision makers – Jay Bryan, Soullier, or Johnson.

Other than his status as vice president, the only potential evidence of Will Bryan's influence over

the decision makers is the fact that Jay Bryan is his father, although Rhodes does not make this

argument.  And there is no evidence that Will Bryan participated in or provided input to the

meetings of the leadership group concerning who was to be retained, reassigned, or terminated.  It

is a plaintiff's burden to prove leverage or influence, and Rhodes fails to advance sufficient

evidence of same as to Will Bryan to withstand summary judgment. *Contra Russell v. McKinney*

*Hosp. Venture*, 235 F.3d 219, 228-29 (5th Cir. 2000) (listing the evidence the plaintiff provided to

prove that the CEO's son was the "*de facto* decisionmaker" and concluding that "[a] jury could

find that Ciulla possessed power greater than that of the ordinary worker at his level due to his

father's position as CEO of the parent corporation and that Ciulla took advantage of that power").

Therefore, Jay Bryan's remarks are the only comments that should be examined under the indirect

evidence standard.

Nonetheless, even assuming that Jay Bryan's comments satisfy both parts of the indirect

evidence test, they are still insufficient proof of pretext because "a comment is not evidence of

discrimination if it is the sole proof of pretext, or if it is not made in temporal proximity to the

adverse employment decision." *Cervantez v. KMGP Servs. Co.*, 349 F. App'x 4, 11 (5th Cir. 2009)

(citing *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir.2003), and *Jenkins v.*

*Methodist Hosps. of Dall., Inc.*, 478 F.3d 255, 261 (5th Cir.2007)).  The Fifth Circuit has repeatedly

held that remarks are probative of discriminatory intent, "so long as [the] remarks are not the only

evidence of pretext." *Palasota*, 342 F.3d at 577; *see also Katseanes v. Time Warner Cable, Inc.*,

---

[77] *Id.*

17

511 F. App'x 340, 346 (5th 2013) ("We have held that stray remarks 'standing alone' are insufficient to create fact disputes."); *Lockhart v. Republic Servs., Inc.*, 2021 WL 4955241, at *4 (5th Cir. Oct. 25, 2021) ("[T]his remark is the only arguable evidence of pretext. As such, it is not probative of discriminatory intent under *Palasota v. Haggar Clothing Co.*").  In other words, "remarks suggesting bias without further evidence of age … animus are insufficient to defeat summary judgment on a circumstantial evidence case." *Wright v. United Parcel Serv., Inc.*, 2020 WL 1494139, at *5 (W.D. La. Mar. 27, 2020) (citing *Drake v. Magnolia Mgmt. Corp.*, 265 F.3d 1059, 1059 (5th Cir. 2001)), *aff'd*, 842 F. App'x 869 (5th Cir. 2021).[78]

Additionally, "'sporadic' comments 'untethered to specific speakers or times' do not show a genuine dispute of material fact as to the ultimate issue – whether defendant intentionally discriminated." *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 322-23 (5th Cir. 2020) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 442 (5th Cir. 2012)); *see also Broussard v. Jazz Casino Co. LLC*, 2018 WL 6046171, at *3 (E.D. La. Nov. 19, 2018) (observing on grant of summary judgment for employer: "The Fifth Circuit 'has repeatedly held that "stray remarks" do not demonstrate age discrimination.'") (quoting *Tex. Instruments*, 100 F.3d at 1181); *Ward v. Gray Television Grp., Inc.*, 2018 WL 11471629, at *7 (W.D. Tex. Apr. 4, 2018) (observing on grant of summary judgment for employer: "Sporadic remarks do not typically indicate 'discriminatory animus.'") (citing *Reed*, 701 F.3d at 441), *aff'd*, 787 F. App'x 850 (5th Cir. 2019).

---

[78] The same holds true for claims of gender discrimination.  Thus, in *Bugos v. Ricoh Corp.*, 2008 WL 3876548, at *6 (5th Cir. Aug. 21, 2008), the Fifth Circuit affirmed summary judgment in favor of an employer after finding insufficient evidence of pretext.  In that case, the plaintiff alleged that his supervisor made certain gender-related comments to him, specifically: "women work harder than men," "women are better received by the customer than men," "women have done better sales at Ricoh than men," and "women are better employees than men." *Id.* at *1.  The district court held that the comments were not probative because they were the only evidence of pretext.  On appeal, the Fifth Circuit analyzed the evidence presented by the plaintiff and concluded: "we agree that [the supervisor's] comments are indeed the only evidence of pretext, and as such, they are not probative." *Id.* at *5.

Here, Rhodes has not indicated when any of Jay Bryan's comments were made; instead, he merely states that five to ten statements were made by Jay (or Will) Bryan at various times over his 14-year tenure as service manager.  Davies, who was terminated by the Bryan Companies 20 months before Rhodes's termination, has likewise failed to note when the comments he heard were made.  However, based on their employment dates, it can be assumed that: (1) all comments made by Jay Bryan to Rhodes likely occurred sometime between October 1, 2005, and July 19, 2019; and (2) all comments made by Jay Bryan to Davies likely occurred sometime between 2006 and November 30, 2017.[79]  A review of the relevant Fifth Circuit cases shows that these statements are too sporadic for Rhodes's claims to survive summary judgment given their relative paucity over the 11-to-14-year interval.  Moreover, Rhodes has not shown that any of the comments were in any way related to his own termination – whether actually or temporally.[80]  In fact, Rhodes states that after hearing the comments, he was reassured by Davies, as well as by Soullier and Will Bryan, that the comments were not about him.[81]

For example, in *Katseanes v. Time Warner Cable, Inc.*, 511 F. App'x 340 (5th Cir. 2013), a plaintiff sued her employer under the ADEA.  The plaintiff, an account executive, alleged that her supervisor made certain comments to another account executive (Rebecca Venegas) that she wanted to "clean house" and "get rid of some of the older" account executives.  *Id.* at 346.  The

---

[79] Rhodes was promoted to service manager on October 1, 2005.  R. Doc. 49-1 at 6.  Davies was promoted to general manager in 2006.  R. Doc. 49-2 at 1.

[80] *See, e.g.*, *Williams v. Red River Beverage Grp.*, 2020 WL 6827794, at *11 (W.D. La. Nov. 19, 2020) (observing on grant of summary judgment for employer: "Williams's assertion that Page's comment constitutes indirect evidence of discrimination falls short.  Again, the Court has been given no indication when in 2016 Page made this comment.  Williams has presented absolutely no argument to suggest that the comment was related to his ultimate termination.  Thus, Williams's case lacks two critical components: temporal proximity and relation or connectivity between the comment and the decision.  ...  Galvanized solely with this one remark, Williams must at the very least come forward with evidence that Page's comment was made at or near the time of his discharge and/or that his discharge stemmed from or could be related back to Page's comment.  However, based upon the record in this case, the comment appears wholly unrelated to Williams's discharge and he has presented no evidence to show otherwise.").

[81] R. Doc. 49 at 8.

evidence showed that the comments were made some time before the plaintiff was fired, but Venegas disclaimed that the supervisor ever said that she wanted to "get rid" of the plaintiff specifically.  The Fifth Circuit found that the comments were "too vague and remote to qualify as legally sufficient evidence of age discrimination."  *Id.*  Therefore, said the *Katseanes* court, under the Fifth Circuit's "stray remarks" case law, the testimony "did not provide a legally sufficient basis for sending the case to the jury."  *Id.*

And in *Tagliabue v. Orkin, L.L.C.*, 794 F. App'x 389, 399 (5th Cir. 2019), a plaintiff brought an ADEA claim against his employer, alleging certain "ageist remarks" in the years prior to his discharge.  The plaintiff alleged that over the years, his direct supervisor made certain age-related comments to him and that he then contemporaneously memorialized them in writing.  Specifically, the plaintiff alleged that five-and-a-half years before his discharge, his supervisor made a comment about the plaintiff becoming "complacent because he was getting older and closer to retirement"; that four years before his discharge, his supervisor made statements suggesting that the plaintiff was friends with Paul Revere; and that both four-and-a-half years before his discharge and two years before his discharge, his supervisor asked him if he was "still awake" or if he was "still with [them]," explaining that he "thought older people already went home."  *Id.*  Addressing these remarks, the *Tagliabue* court stated:

> Although not direct evidence of discrimination, [the supervisor's] remarks are relevant evidence to be considered as part of a broader circumstantial case of age discrimination.  However, we have repeatedly held that stray remarks cannot be the sole proof of age discrimination.  Aside from these comments, [the plaintiff] provides no other evidence to support his claim that he was discharged because of his age.  Because [the supervisor's] alleged comments are *not proximate in time* to [plaintiff's] retirement (he made them years prior) and are *not related to the disputed employment action*, they are – *without additional evidence of age discrimination* – insufficient to defeat summary judgment.

*Id.* (citations and footnotes omitted; emphasis added).  Accordingly, the Fifth Circuit affirmed the district court's summary judgment in favor of the employer.

Likewise, the comments cited by Rhodes are too vague and remote to qualify as legally sufficient evidence of age discrimination.  Nor does Davies's declaration cure the shortcomings in Rhodes's testimony.  The age-related comments Davies identifies were heard at least 20 months before Rhodes was terminated, and they were not specifically about Rhodes.  Indeed, Rhodes testified in his deposition that he was reassured that the jokes and comments were not about him. Because Rhodes does not provide any estimate of when the statements occurred or evidence that they were about him or related to his termination, and because the comments are his only alleged evidence of pretext, he has failed to offer sufficient evidence to overcome the Bryan Companies' legitimate, non-discriminatory reasons for terminating him.  Rhodes has therefore failed to produce sufficient evidence, at least with respect to the alleged discriminatory comments, to meet his burden under the third step in the *McDonnell Douglas* analysis.

### b.  *Hiring a Less Qualified Candidate*

Rhodes also attempts to prove pretext by alleging that he was "clearly better qualified" than Gullo.[82]  "The 'bar,' however, 'is set high for this kind of evidence.'"  *McMichael*, 934 F.3d at 459 (citing *Moss*, 610 F.3d at 922-23).  As stated by the Fifth Circuit in *McMichael*:

> A plaintiff cannot satisfy his burden by showing a large discrepancy in age.  Nor can the plaintiff satisfy his burden by showing that he is "merely better than or as qualified" as his replacement.  Instead, he must show that his replacement, if any, is clearly less qualified.
>
> To carry this heavy burden, a plaintiff must show that "the qualifications are so widely disparate that no reasonable employer would have made the same decision." Differently put, the plaintiff must submit "evidence from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"

---

[82] R. Doc. 49 at 10.

*Id.* (internal citations omitted).  Further, "'[a]n attempt to equate years served with superior qualifications is unpersuasive.'  'Obviously, work experience is one component of defining who is more qualified,' but 'greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another.'"  *Moss*, 610 F.3d at 923 (quoting *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir. 1996)) (internal citations and alterations omitted).

Rhodes argues that Gullo was "significantly less qualified by experience and training for the position."[83]  Specifically, Rhodes notes that he was an ASE Master Mechanic, certified in all eight of the major areas of certification for a mechanic,[84] while Gullo was not an ASE Master Mechanic and, to his knowledge, had none of the ASE standard mechanic certifications.[85]  Rhodes also argues that, at the time of his termination, Gullo had just two years' experience as a service manager, while Rhodes had nearly fourteen.  However, as explained above, years of service cannot be equated with superior qualifications.  Additionally, Rhodes admits that, as a service manager, Gullo supervised more employees than he did and had twice the vehicle repair volume and twice the revenues.[86]  Rhodes also admits that he recommended that Gullo be promoted to service manager,[87] and it is never alleged that the ASE certifications were requirements of the position.  The fact that Rhodes had additional, unrequired certifications does not in itself prove that he was clearly better qualified. *See Oldenburg v. Univ. of Tex. at Austin*, 860 F. App'x 922, 925 (5th Cir. 2021) ("Both candidates had the required bachelor's degree and five years' experience developing and managing training programs. [The plaintiff's] contention that her professional certification and

---

[83] *Id.* at 6.
[84] R. Doc. 52-1 at 1.
[85] R. Doc. 49 at 9.
[86] R. Doc. 49-1 at 5, 10.
[87] *Id.* at 16.

longer tenure in the field make her 'clearly better qualified' is unavailing.").    Rhodes has simply not met his burden of proving that no reasonable person could have chosen Gullo over him.  Hence, this ground for pretext also fails.

### c.   Additional Factors

While the Court finds that Rhodes has not provided sufficient evidence of pretext, it will nonetheless address each of the four additional arguments raised by the Bryan Companies.  The Bryan Companies urge: (1) that the leadership team's collective decision-making negates an inference of discrimination; (2) that all three members of the leadership team were in the same protected class and thus discrimination is less likely; (3) that the same-actor inference applies because Jay Bryan both hired and fired Rhodes; and (4) that, in connection with the reduction-in-force (and, thus, Rhodes's termination), younger employees (including managers) were fired while older employees (including managers) were retained.

It is true that some courts have found that a collective decision-making process may negate an inference of discrimination.  *Jefferson v. Hosp. Partners of Am.*, *Inc.,* 2009 WL 8758090, at *17 (S.D. Tex. May 18, 2009), *aff'd sub nom. Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485 (5th Cir. 2010).  It is also true that "discrimination is less likely when the supervisor is in the same protected class as the plaintiff."  *McMichael*, 934 F.3d at 460.  In *McMichael*, the court concluded that because two of the three people who terminated the plaintiff were in the same age-protected class (ages 57 and 51), "[t]heir ages make discrimination less likely."  *Id.* at 461.  Here, a leadership team of three managers collectively made the decision to retain Gullo and terminate Rhodes, and all three members of the leadership team were in the protected class, at ages 60, 67, and 48,[88] thus making discrimination less likely.

---

[88] R. Docs. 49-1 at 2.

Additionally, when the person responsible for hiring the employee is the same person to terminate the employee, a "'strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.'" *Nazarov v. La. State Univ.*, 2010 WL 1930074, at *6 (E.D. La. May 10, 2010), *aff'd*, 425 F. App'x 405 (5th Cir. 2011) (quoting *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir. 1991) (Wilkinson, J.), cited favorably in *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir.1996)).  However, this inference arises when the employee is "hired and fired by the same actor *within a short time period*."  *LaRosa v. Harvey Operations-T, LLC*, 2020 WL 6059646, at *5 (E.D. La. Oct. 14, 2020) (emphasis added).  Because Rhodes was promoted by Jay Bryan in 2005 and terminated by Jay Bryan, among others, in 2019, the Court finds that the same-actor inference is not applicable.

Lastly, "age discrimination is less likely when the employer retains other older employees and fires younger ones ….  In such situations, '[t]he logical inference is that age was not a factor.'" *McMichael*, 934 F.3d at 461 (quoting *Kelly v. Costco Wholesale Corp.,* 632 F. App'x 779, 783 (5th Cir. 2015)).  Here, while there were only two service managers employed by the Bryan Companies and one was terminated, there is evidence of 85 other employees being terminated in July of 2019.  Therefore, looking to the large-scale reduction-in-force following the sale of the Chevrolet dealership, the evidence shows that 55 of the 86 employees terminated were over the age of 40, and 23 of those 55 were over the age of 60.[89]  However, there is no evidence of the ages of the approximately 50 employees retained by the Bryan Companies.[90]  Accordingly, this argument cannot be adequately addressed on this record.

In sum, two of the four additional factors advanced by the Bryan Companies also weigh against Rhodes's claims of age discrimination.

---

[89] R. Doc. 38-4 at 102-03.
[90] R. Doc. 38-3 at 5.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the Bryan Companies' motion for summary judgment (R. Doc. 38)

is GRANTED, and Rhodes's claims of age discrimination are dismissed with prejudice.

New Orleans, Louisiana, this 3rd day of October, 2023.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE